

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00118-CR

_____

Ex parte Paul Daniel Dedrick

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR20-0735

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The State charged Appellant Paul Daniel Dedrick with continuous sexual abuse of a child (CSA) and related individual counts, but the trial court granted his request for a mistrial after the State disclosed to defense counsel mid-trial the video footage from the bodycam of a Parker County Sheriff's Office (PCSO) deputy who had responded to the complainants' family's 911 call. A prosecutor assigned to the case had previously been told by a PCSO employee that the footage was unavailable. The State urged the trial court to grant a continuance rather than a mistrial, but scheduling difficulties made a continuance impractical, so the trial court ordered a mistrial. Dedrick then filed an application for habeas corpus relief, arguing that his retrial was barred by double jeopardy. The trial court denied relief.

In a single point, Dedrick argues that the trial court abused its discretion by denying habeas corpus relief because the State's misconduct had forced him to move for a mistrial. Because the record supports a determination that the mistrial was not caused by the prosecutors' intentional conduct, we will affirm the trial court's order denying Dedrick's pretrial application for writ of habeas corpus.

### Background

The State charged Dedrick by superseding indictment in five counts, all related to sexual conduct toward a child.[1] Count I alleged CSA committed against two

---

[1]To provide context for the allegations of misconduct in this case, we will explain how these charges arose. We have drawn this information from the evidence

complainants: Dedrick's stepdaughter, Lauren, and Lauren's cousin Amy.[2] Specifically, the indictment alleged that Dedrick had, during a period that was thirty or more days in duration between July 9, 2016 and June 10, 2019, committed two or more acts of sexual abuse:

> (1) By touching any portion of the genitals of [Lauren], a child younger than 14 years of age, with the intent to arouse or gratify the sexual desire of the said defendant in violation of Sec. 21.11(a)(1) of the Texas Penal Code; or
>
> (2) By intentionally or knowingly causing the penetration of the female sexual organ of [Lauren], a child younger than 14 years of age, with the finger of the defendant, in violation of Sec. 22.021(a)(1)(B)(i) of the Texas Penal Code; or
>
> (3) By intentionally or knowingly causing the female sexual organ of [Lauren], a child younger than 14 years of age, to contact the mouth of the defendant, in violation of Sec. 22.021(a)(1)(B)(iii) of the Texas Penal Code; or
>
> (4) By causing [Amy], a child younger than 14 years of age, to touch the genitals of the defendant with the intent to arouse or gratify the sexual

---

at the underlying trial and from video recorded by a PCSO deputy's bodycam. We recognize that, at this time, no jury has made any fact findings regarding these alleged offenses, and it is not the role of this court to assess the credibility of any trial witnesses. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, as we discuss below, in ruling on Dedrick's habeas petition, the trial court would have considered whether the prosecutors intentionally provoked Dedrick into seeking a mistrial. The content of the trial evidence and the deputy's bodycam footage is relevant to that determination.

[2]To protect the children's identities, we use pseudonyms for them and for family members. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); 2d Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

desire of the said defendant in violation of Sec. 21.11(a)(1) of the Texas Penal Code; or

(5) By intentionally or knowingly causing the sexual organ of the said defendant to contact or penetrate the mouth of [Amy], a child younger than 14 years of age in violation of Sec. 22.021 of the Texas Penal Code.

*See* Tex. Penal Code Ann. §§ 21.02, 21.11, 22.021.

In Counts II through V, the State individually alleged all but one of the same acts as to the same two complainants—specifically, that Dedrick had

- "on or about the 9th day of July, 2016, . . . intentionally or knowingly cause[d] the penetration of the female sexual organ of [Lauren], a child who was then and there younger than 14 years of age, with the finger of the defendant" (Count II);

- "on or about the 9th day of July, 2016 . . . with the intent to arouse or gratify the sexual desire of the defendant, engage[d] in sexual contact with [Lauren], . . . by touching the genitals of the complainant, a child younger than 17 years of age" (Count III);

- "on or about the 10th day of June, 2019, . . . intentionally and knowingly cause[d] the mouth of [Amy], a child who was then and there younger than 14 years of age, to contact the sexual organ of the defendant, and the said [Amy] was then and there younger than six years of age at the time" (Count IV); and

- "on or about the 10th day of June, 2019, . . . with the intent to arouse or gratify the sexual desire of the defendant, cause[d] [Amy], . . . a child younger than 17 years of age, to engage in sexual contact by causing the complainant to touch the genitals of the defendant" (Count V).

*See id.*

According to testimony at Dedrick's trial, the allegations first came to light through Amy's outcry to her grandmother (Grandmother) in March 2020 while the two were playing with dolls. Amy described an incident when she had spent the night

4

at her cousin's house and slept on the couch, and Dedrick had awakened her and instructed her to put his penis in her mouth, which she did.[3] After the disclosure, Grandmother called a family meeting for the next day with her son and two daughters—Amy's mother and Lauren's mother. While Amy and Lauren played in the back of the house, Grandmother disclosed what Amy had told her, and the family called 911.

PCSO deputy Westyn Grimes was dispatched to Grandmother's home. His bodycam recorded Grandmother telling him what Amy had reported to her. At Grimes's request, Grandmother wrote a statement about Amy's outcry. Meanwhile, apparently while Grimes was speaking to Grandmother, Lauren's mother had pulled Lauren aside and asked her if Dedrick had ever hurt her or touched her, and Lauren nodded "and pointed to her vagina" but did not provide details. The family then disclosed to Grimes that Lauren had also been a target of Dedrick's sexual abuse, although they did not provide Grimes with details. In the video, both mothers appeared tearful and told Grimes that they had just learned that day about what had happened.

Grandmother told Grimes that she had tried to record Amy talking about what Dedrick had done. She played a few seconds of a recording on her phone. The only part of the recording captured by the bodycam was Amy stating her name and then

_____

[3]Amy told Grandmother that he had told her to "suck his balls," but at trial she testified that he had "instructed [her] to suck on his penis."

someone (presumably Grandmother) saying something, at which point Grandmother stopped the playback. Grandmother told Grimes she could send him the recording, so she attached the recording to an email draft on her phone. While Grimes typed in his email address, she told him that she should add one more point to her statement:

> Grandmother: You know, but he never touched her. I should put that down. She said he never touched her.
>
> Grimes: So—so it was just him—
>
> Grandmother: Uh huh.
>
> Grimes: —just self—
>
> Grandmother: Mm-hmm.[4]

Grimes then handed back her phone, and she appeared to send the email. Grimes told the family that a PCSO investigator, Darrell Self, would be handling the investigation. Self's investigation ultimately led to the charges against Dedrick.

At trial and at the subsequent habeas hearing, prosecutors explained how, due to a series of missteps, the bodycam footage was not turned over to defense counsel until mid-trial. PCSO stored some of its digital evidence locally in its own records management system, but it also used Axon, a cloud-based evidence management system, to store bodycam video. Grimes had uploaded the footage to Axon, but when

---

[4]This was consistent with her trial testimony, during which she relayed how Amy had described the incident on the couch with Dedrick. Grandmother testified that after Amy told her what had happened, she asked Amy, "[D]id he do anything to you? Did he touch you? Did he put his hands anywhere else? . . . She said no. She said he just laid me down and covered me up, and I went back to sleep."

entering the case number in the system, he mistyped the number by including an extra dash. Accordingly, if a person were to search in the system using the correct case number, the file would not be included in the search results. However, the file could be found by searching for Grimes's name.

Employees of the Parker County District Attorney's Office (D.A.'s Office) do not have direct access to all files stored in Axon. Instead, PCSO must first designate a file in the system as "shared." Grimes's bodycam video was not designated by PCSO as shared, meaning that although a PCSO employee could find the file by searching by Grimes's name, no one from the D.A.'s Office would be able to see the file.[5]

In October 2020, Parker County suffered a ransomware attack. As a result, PCSO lost the evidence that it had stored in the local records management system, including digital files like 911 call recordings. The attack did not, however, affect files stored in the cloud-based Axon system.

Prosecutor Albert Charanza was assigned to Dedrick's case in January 2023. The case was scheduled for trial in December 2024. In November 2024, Charanza attempted to access files associated with the case stored through Axon but was unable to do so. Charanza emailed D.A.'s Office employee Jennifer Riedy, stating, "I am

---

[5]It is not clear from the record who would be responsible for sharing this particular file with prosecutors. Self testified at trial that he was unsure how PCSO "keep[s] that evidence because it was all done digitally." He said, "I didn't file—that's not part of the evidence that I move over to the prosecutor's office. It's done by my secretary in CID, and I don't—there's just a lot about it I don't know." Moreover, he had not worked for PCSO since 2021.

needing permission to review the following cases on A[xon] related to Paul Dedrick. They may have expired[6]: 2020-00898 [and] 2020-01007."

Riedy forwarded the email to two PCSO employees, telling them, "Please re-share the following links on Paul Dedrick." One of the employees, Jessica Vandygriff—who had been a PCSO employee at the time of the ransomware attack but not in the records department—replied, "We do not have anything for these two cases in Axon. This was prior to the malware attack." Riedy forwarded that response to Charanza.

The State had previously provided some electronic discovery to Dedrick, but it had not provided Grimes's bodycam footage, which, as noted, PCSO had never designated as "shared" in Axon. On December 1, 2024, the day before trial proceedings were to begin, Dedrick's attorney requested Grandmother's 911 call and the bodycam footage. Charanza replied that neither was available because of the ransomware attack and that the only media that the prosecution had was the media that had previously been provided on a disc.

Testimony began on December 3. On the first day of testimony, Amy, Amy's mother, Lauren, Lauren's mother, and Grandmother all testified. The State also presented testimony from Self. On cross-examination, Dedrick's attorney asked Self if Grimes had been wearing a bodycam when he responded to Grandmother's 911 call;

---

[6]Files in Axon are automatically archived after a certain amount of time. An archived file must be "accessed" before it can be shared.

Self answered, "I assume so." Self further testified that he had not reviewed any footage from the bodycam and does not typically review a reporting deputy's bodycam footage before obtaining a warrant in an investigation. When asked if it would have been helpful to the jury to review the bodycam footage, he replied, "Possibly." On re-direct, the prosecutor asked Self about the ransomware attack; Self said that the attack had "corrupted or destroyed or stole our digital evidence."

Later that day or the next morning, prosecutor Abigail Placke texted April Little, a PCSO records department employee whom Placke had known professionally for years. Placke was the other prosecutor assigned to the case, and she asked Little to appear at trial to testify about the ransomware attack and the loss of evidence that the attack had caused.

Before testifying, Little undertook a search for the footage so that she could testify from personal knowledge that the bodycam footage could not be found. Little had worked in the records department since before the ransomware attack and, unlike some PCSO employees, she was aware that bodycam footage uploaded to Axon should not have been affected by the attack. Little first tried searching for the file by case number, but like Vandygriff's, her search was unsuccessful. She then searched by Grimes's name and date, found the file, and discovered that Grimes had mistyped the case number.

9

Little texted Placke that she had located the file, which she noted had been "mislabeled by the deputy." Little downloaded the file, and the prosecutors then disclosed the file to Dedrick's attorney.

Dedrick's attorney moved for a mistrial based on the untimeliness of the bodycam footage disclosure, which she contended was exculpatory, and she argued that the untimely disclosure was a violation of Texas Code of Criminal Procedure Article 39.14. She did not say what statements in the video were exculpatory.[7] The State countered that granting a continuance would be an adequate remedy. Alternatively, the State offered to have any witness recalled or to allow Dedrick to put the bodycam footage into evidence without a sponsoring witness.[8] After hearing arguments, the trial court granted a mistrial on the basis that the trial could not be continued due to the court's calendar, the upcoming holidays, and the unavailability of several of the jurors. Dedrick's attorney requested that the mistrial "be with the [Article] 39.14 violation," but the trial court declined to modify its ruling.

The State then filed a second superseding indictment. That indictment added a new count based on Lauren's trial testimony—that Dedrick had, on or about March

---

[7]Similarly, for most of his appellate brief, Dedrick does not explain what part of the video is exculpatory. On the last page of his brief, however, he quotes Grandmother's statement to Grimes that "[s]he said he never touched her." She did not quote Grimes's follow-up question clarifying that it was "just [Dedrick]" and Grandmother's agreement with that comment.

[8]Grimes was apparently away on vacation during the trial proceedings.

25, 2020, "with the intent to arouse and gratify the sexual desire of another, engage[d] in sexual contact by touching the breast of [Lauren], a child younger than 14 years of age" (Count VI). The second superseding indictment still alleged continuous abuse of a child in Count I, but it differed from the previous indictment in that it

- expanded the time period in which the alleged acts had occurred from July 9, 2016–June 10, 2019 to July 9, 2014–March 25, 2020, and

- deleted the third CSA act alleged to have been committed against Lauren in the previous indictment—the allegation that Dedrick had caused Lauren's sexual organ to contact his mouth in violation of Penal Code Section 22.021(a)(1)(B)(iii).

Dedrick filed an application for writ of habeas corpus, asserting that his retrial was barred by the Double Jeopardy clauses in the federal and state constitutions. He claimed that the D.A.'s Office had engaged in a deliberate course of conduct of making untimely disclosures of discovery to gain a "strategic advantage." The State filed a response supported by the affidavits of Charanza and Placke.

The trial court held a hearing at which Charanza, Placke, Little, and Vandygriff testified, as well as PCSO Captain Marc Fletcher. From the witnesses, the trial court heard testimony that PCSO employees had not been trained on whether evidence had been destroyed in the ransomware attack, that Little would not have been the correct person for the D.A.'s Office to contact for production of evidence in the case, and that Vandygriff was the proper person to ask.

After the hearing, the trial court denied relief. Dedrick now appeals.

**Standard of Review**

A habeas applicant has the burden to prove the claim by a preponderance of the evidence. *Ex parte Valenzuela*, No. 02-24-00178-CR, 2025 WL 1599973, at *7 (Tex. App.—Fort Worth June 5, 2025, no pet.) (mem. op., not designated for publication) (citing *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013)). We review a trial court's ruling on a pretrial writ of habeas corpus for abuse of discretion, viewing the facts in the light most favorable to the ruling. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *Ex parte McIntyre*, 558 S.W.3d 295, 299 (Tex. App.—Fort Worth 2018, pet. ref'd). Our review is de novo, however, when there are no disputed facts and the resolution of the ultimate issue turns on an application of purely legal standards. *McIntyre*, 558 S.W.3d at 299 (citing *Ex parte Martin*, 6 S.W.3d 524, 526 (Tex. Crim. App. 1999)). We will uphold the trial court's ruling if it is correct on any theory of law applicable to the case. *Id.*

**Discussion**

## I. Applicable Law

In general, when the trial court grants a defendant's request for a mistrial, double jeopardy does not bar retrying the defendant. *Ex parte Masonheimer*, 220 S.W.3d 494, 506 (Tex. Crim. App. 2007); *Valenzuela*, 2025 WL 1599973, at *6. However, a narrow exception exists to the general rule in certain cases in which improper prosecutorial conduct led to the mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 678–79, 102 S. Ct. 2083, 2091 (1982); *Masonheimer*, 220 S.W.3d at 506. Texas courts have

applied the *Kennedy* exception to two circumstances in which, with the intent to avoid an acquittal, the prosecutor committed an act that led to the defense-requested mistrial: (1) the trial was "going badly" for the prosecutor, so the prosecutor committed misconduct to provoke the defendant into requesting the mistrial, *Ex parte Wheeler*, 203 S.W.3d 317, 323 (Tex. Crim. App. 2006), and (2) the prosecutor intentionally failed to disclose exculpatory evidence, *see Masonheimer*, 220 S.W.3d at 507–08 & nn.18, 20.

In the first circumstance, courts apply the following factors in evaluating whether the prosecutor intended to provoke the defendant's mistrial:

(1) "Was the misconduct a reaction to abort a trial that was 'going badly for the State?' In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?"

(2) "Was the misconduct repeated despite admonitions from the trial court?"

(3) "Did the prosecutor provide a reasonable, 'good faith' explanation for the conduct?"

(4) "Was the conduct 'clearly erroneous'?"

(5) "Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?"

(6) "Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional[9] . . . misconduct?"

---

[9]Citing *Ex Parte Bauder*, Dedrick argues that his retrial is barred if the mistrial was "caused by the prosecutor recklessly or intentionally." *See* 974 S.W.2d 729, 732 (Tex. Crim. App. 1998). However, nearly twenty years ago, the Court of Criminal

*Wheeler*, 203 S.W.3d at 323–24; *see Ex parte Roberson*, 455 S.W.3d 257, 260 n.1 (Tex. App.—Fort Worth 2015, pet. ref'd) (noting that although *Wheeler* referred to intentional or reckless conduct, it has since been limited to intentional conduct). "The analysis of these factors is intended '[t]o differentiate the kind of intentional goading conduct [that] invokes the Double Jeopardy Clause from the inevitable mistakes made during a rough and tumble trial.'" *Valenzuela*, 2025 WL 1599973, at *6–7 (quoting *Ex parte Watson*, No. 01-19-00637-CR, 2020 WL 7517453, at *6 (Tex. App.—Houston [1st Dist.] Dec. 22, 2020, no pet.) (mem. op., not designated for publication)).

As to the second circumstance, the exception applies if a defendant's mistrial motion was "necessitated primarily by the State's 'intentional' failure to disclose exculpatory evidence that was available prior to [the defendant's] first trial with the specific intent to avoid the possibility of an acquittal." *Masonheimer*, 220 S.W.3d at 507, 508 n.20 (concluding that the evidence in the case supported a finding that the prosecution had attempted "not to get caught intentionally committing some erroneous act ([in that case,] not disclosing evidence) with the specific intent to avoid a probable defeat"). *Masonheimer* involved "unique facts" in which the State wanted to try the defendant for a third time after the first two proceedings had been terminated at the defendant's request, and in each instance, the mistrial had resulted from the State's "*intentional* failure to disclose exculpatory evidence *with* the specific intent to

_____

Appeals held that the *Kennedy* exception applies only to intentional conduct. *Ex parte Lewis*, 219 S.W.3d 335, 337, 358–59 (Tex. Crim. App. 2007).

avoid an acquittal at the first proceeding." *Id.* at 495 (emphases added). The court held that under those unique circumstances, the defendant had suffered the same harm as when the State intentionally provokes a mistrial motion by the defense. *Id.* at 508–09.

Under either *Kennedy* circumstance, "the ultimate question is whether the prosecutor acted with an intent to subvert [the defendant's] right to have his [or her] guilt or innocence determined before the first trier of fact." *In re T.H.*, No. 04-24-00710-CV, 2025 WL 1949742, at \*7 (Tex. App.—San Antonio July 16, 2025, no pet.) (mem. op.) (citing *Kennedy*, 456 U.S. at 675–76, in juvenile case); *see Kennedy*, 456 U.S. at 675–76, 102 S. Ct. at 2089 (stating that retrial will not be barred "absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause"). Conduct "that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion," is not sufficient to bar retrial. *Kennedy*, 456 U.S. at 675–76, 102 S. Ct. at 2089.

## II. Application of Law to Facts

### A. "False narrative" neither knowingly false nor intended to provoke mistrial

In his sole point, Dedrick argues "[t]he trial court abused its discretion in denying habeas relief because the State's misconduct was calculated to avoid an acquittal *through the injection of a false narrative*, which forced [him] to move for a mistrial." [Emphasis added.] By "false narrative," he means the State's questioning Self about the ransomware attack and how it had caused PCSO to lose digital

evidence, with the suggestion that Grimes's bodycam video was among the lost evidence. Dedrick contends that prosecutors asked Self about the ransomware attack to "try to paint the picture that the video [had been] destroyed" so as to "combat any defensive theories and decrease questions in the jurors['] heads." He further argues that the prosecutors' plan to call Little to testify that the video did not exist was an act to "abort a trial that they believed was going badly."[10]

Dedrick's brief is unclear as to whether his argument is that the State's injection of a false narrative was a sign that the trial was not going well for the State, which led to the State's producing the footage in order to provoke a mistrial, or if the "false narrative" was itself the act of alleged misconduct by which the State intended to provoke a mistrial. We address the latter argument here and the former in the next section.

*Kennedy* only applies to intentional behavior, and its provoked-the-mistrial exception applies to a prosecutor's intentional conduct during trial only when the intentional behavior was done with the intent to goad the defense into moving for a mistrial. *Lewis*, 219 S.W.3d at 337, 358–59. Here, there was no evidence that prosecutors asked Self about the ransomware attack or called Little to testify in order to provoke a mistrial. As we discuss more below, the only evidence is that until Little told them otherwise, prosecutors believed that the evidence had been lost. Further,

---

[10]Dedrick does not explain how, if Little *had* testified that the video did not exist, the testimony could have prompted him to request a mistrial.

16

there is no evidence that prosecutors had any reason to believe that raising the ransomware attack in front of the jury would provoke defense counsel to move for a mistrial, much less that they raised it for that purpose. Indeed, defense counsel did not seek a mistrial when the ransomware attack was raised by the State. To the extent that Dedrick argues that raising the ransomware issue was intended to provoke a defense-requested mistrial, we overrule this part of his point.

### B. Record does not support provoke-the-mistrial exception

Dedrick further argues that prosecutors realized that the trial was going badly, and so in order to provoke a mistrial, they disclosed the bodycam video's existence in the middle of trial, "[i]njecting this *Brady* violation into the case and in front of the jury" as "an intentional sabotage of the case." In support of this argument, he addresses each of the *Wheeler* factors. However, his arguments are not supported by the record.

### 1. Was the misconduct an attempt to abort a trial that was going badly for the State?

Addressing the first factor, Dedrick makes several arguments to show that the trial was going badly for the State. He contends that the State "had failed to prove that there were two or more qualifying acts of sexual abuse that occurred 30 days apart" and had "failed to prove the timing of the alleged acts." He further asserts that the State had willfully suppressed the bodycam footage, but that after defense counsel "exposed the absence" of that evidence "as a cornerstone of its strategy," the State

17

felt the need to call Little to testify that the video did not exist. Additionally, after the mistrial was declared, Charanza "spoke to the jury about issues with proof, as well as credibility issues with the State's witnesses." He contends that for these reasons, the State produced the video to provoke a mistrial.

At the habeas hearing, Charanza and Placke testified that until the mistrial they believed that the trial was going well, and the trial court had evidence from which it could find that testimony credible. Amy's and Lauren's testimony covered the alleged acts of abuse and when they occurred, and if believed by the jury, their testimony could establish the charged CSA offense. *See* Tex. Penal Code Ann. § 21.11(a)(1), 22.021; Tex. Code Crim. Proc. Ann. art. 38.07(b)(1) (providing that a conviction under Penal Code Section 21.11 or 22.021 is supportable on the uncorroborated testimony of the complainant if the complainant was 17 years of age or younger).

Amy testified that the abuse happened when she was "five or six," which would have been in 2018 or 2019, but that she did not disclose what had happened for "a little while." Lauren testified that the abuse happened when she was nine or ten years old, meaning in or after July 2015 (when she turned nine) and before her eleventh birthday in July 2017. Amy described an act alleged in the CSA count, and Lauren described at least two. Lauren further testified that the acts happened once a month for a year or two. Lauren did not testify to one of the acts of abuse alleged in the CSA count—and the State dropped that allegation in the second superseding indictment following the mistrial—but even without testimony about that allegation,

18

the jury had evidence from which it could have found Dedrick guilty if it found Amy and Lauren to be credible.

Dedrick argues that when questioned after the mistrial, the jurors expressed confusion about the timeline of the alleged abuse and seemed to doubt some of the State's witnesses' testimony. Dedrick also references the State's filing a second superseding indictment that alleged a wider timeline for the offenses and dropped an allegation about which Lauren had not testified. He argues that "[t]he State knew that [the] mid-trial disclosure [of the bodycam footage] would force [him] to request a mistrial and would afford them an opportunity to reindict the case and present it again to a new jury."

Charanza agreed at the habeas hearing that when he had talked to jurors after the mistrial, "they also had some questions about the timeline." He did not testify that jurors had expressed doubts about a witness's credibility, and Placke disagreed that there were credibility issues. However, even if some jurors later expressed doubt about parts of the testimony, nothing in the record shows that the prosecutors were aware of those jurors' doubts when they disclosed the bodycam footage to Dedrick. Further, Placke testified that she had never tried a child sexual abuse case that went as planned, so she had not been surprised when Lauren did not testify to every act that Placke had expected. Additionally, regarding the allegation that was dropped in the second superseding indictment, as noted above, it would have been unnecessary for the jury to have evidence of that allegation in order to find Dedrick guilty of CSA.

19

Further, the State's superseding the indictment *after* the mistrial to expand the timeline of events is of limited value in evaluating what the State believed *before* the mistrial about its chance of conviction. As stated, even using the timeline in the previous indictment, the jury heard testimony that, if believed, could establish that Dedrick's acts were within that indictment's timeline.

Moreover, aside from the prosecutors' testimony about their opinion of the case, the trial court had another indication that the prosecutors had believed at the time that the trial was going well: they had made clear to the trial court that they did not want a mistrial, and they asked the court to provide some other option to Dedrick. They specifically requested a continuance and suggested recalling Grandmother to testify about what she had said in the video or allowing the defense to introduce the video without a sponsoring witness. *See Razo v. State*, No. 02-11-00161-CR, 2012 WL 3207271, at *4 (Tex. App.—Fort Worth Aug. 9, 2012, no pet.) (mem. op., not designated for publication) (considering prosecutor's "continued attempt to persuade the court that a mistrial was improper" in reviewing trial court's determination that prosecutor had not intentionally provoked defendant into moving for mistrial). If, as Dedrick argues, the evidence was exculpatory, then Dedrick could have taken advantage of those other options to put the video before the jury. *See Ex parte Stewart*, No. 04-17-00249-CR, 2018 WL 1610920, at *4 (Tex. App.—San Antonio Apr. 4, 2018, no pet.) (mem. op., not designated for publication) (noting that the defendant had a lesser remedy—in that case, a continuance—that he

chose not to use instead of a mistrial). The record indicates that Dedrick wanted a mistrial, but the State did not.

In summary, the trial court could have found that, at the time the mistrial was granted, the prosecutors believed that the trial was going well.

**2. Was the misconduct repeated despite the trial court's admonishments?**

"This factor focuses on the wilfulness of repeated misconduct by the prosecutor." *Wheeler*, 203 S.W.3d at 328. The State did not repeat the behavior in this case; the trial court granted a mistrial once the failure to turn over the bodycam footage came to light, and there was no evidence that after the mistrial, it was discovered that the State had failed to turn over additional evidence. Further, the record does not reflect that the State was admonished by the trial court, and the trial court did not grant the mistrial on the basis of any State misconduct.

Dedrick contends, however, that the State has repeated the behavior despite admonishments. He argues that the D.A.'s Office has "shown a disturbing pattern of failing to turn over exculpatory evidence in cases alleged to have been committed from 2020–2021" and "ha[s] been admonished repeatedly in the past for these failures and ha[s] not taken the simple steps of checking for discovery before sending a standardized form disclos[ing] that the evidence does not exist." The record does not support these allegations.

Dedrick produced evidence of only one other case in which the D.A.'s Office had made a late disclosure of discovery. In that instance, a different law enforcement

agency—the Weatherford Police Department—had custody of a recording that had not been turned over to prosecutors until right before or after jury selection in that case. The State had, however, produced to the defense an offense report that referenced the recording, and thus in theory, both the State and defense counsel could have realized that the recording existed and had not been produced. Charanza testified at the habeas hearing that he did not recall being admonished by the trial court in that case, and Placke testified that if any judge had spoken to the District Attorney about the case, she was unaware of it. In other words, this was a different case that involved (1) a different law enforcement agency, (2) a failure to disclose evidence that should have been apparent to both the State *and* the defense, (3) a subsequent disclosure by the State that occurred before testimony had begun, and (4) a record containing no evidence of admonishment by the trial court.

Dedrick further points to two other pieces of evidence that he contends were not produced by the State. First, he argues that the State failed to turn over a recording that Grandmother had made of Amy. He acknowledges that the State gave him a recording, but he argues that the bodycam footage showed that State also had a different recording that it had not produced. He points to the part of the bodycam footage in which Grandmother told Grimes that she had recorded Amy making the allegation against Dedrick. As noted above, in the video, Grandmother started to play a recording on her phone but stopped it after a few seconds. Dedrick says that the brief clip that Grandmother played in the bodycam footage does not match the audio

22

of the recording that defense counsel received in discovery. However, there is no evidence in the record that the State has any recording of Amy in its possession, custody, or control other than the one that it already produced to Dedrick.

Charanza addressed the issue at the habeas hearing. He was asked whether he had watched the bodycam video—and more specifically if he had watched "the part of the body cam where Deputy Grimes is obtaining the audio from [Grandmother] of [Amy]"—and if he knew if there was "still missing audio that defense counsel ha[d] not received." Charanza answered that he had watched the video, that he did not believe there was any missing audio, and that "[t]he audio provided by [Grandmother] that was provided in the discovery is the complete audio." He stated that while only Grandmother could say what recording she had played for Grimes, he did not believe that it was a different recording than what had been provided to the defense, and he further stated that "[i]f there's another recording, it would be in the possession of [Grandmother], and not law enforcement." He was unequivocal in his testimony that "they [the defense] have what we have."

Thus, the record evidence is that the only recording that Grandmother had given law enforcement is the same recording that had also been provided to defense counsel. If Grandmother has a different recording of Amy in her possession, Article 39.14 did not require the State to provide it to defense counsel. *See Ex parte Carrasco*, No. 08-25-00004-CR, 2025 WL 2487800, at *11 (Tex. App.—El Paso Aug. 28, 2025, no pet.) (mem. op., not designated for publication) (stating that the fact that State may

23

have been aware that child had been taken to hospital for examination "does not constitute evidence that the State or any of its agents had the hospital records in their possession, custody, or control prior to trial" and that State had no duty to seek out and disclose information that was outside the State's possession). Moreover, the trial court did not admonish the State for failing to produce any recording of Amy.

Second, Dedrick argues that "Defense Counsel also has not received a copy of the statement that [Grandmother] is seen writing with the [sic] regards to the 'she said he never touched her comment.'" As we understand his argument, he is not asserting that the State did not provide him with a written statement from Grandmother, but he argues that the written statement he received does not correspond to what she said on the bodycam video. However, the record does not support a finding that the State had a different written statement that it failed to produce or that the trial court had admonished the State for failing to produce it.

We have found no testimony or other evidence produced at the habeas hearing about a statement that had not been provided, and Dedrick's brief does not provide a record reference for where any such evidence can be found. As for whether Dedrick raised the issue of a different witness statement at the trial, the only assertion in the trial transcript that could possibly refer to such a statement is his counsel's argument that "much of the [bodycam] video that does contain both new information and what we believe would be exculpatory information comes from [Grandmother's] portions that she is on, . . . including a different recording that was given to the defense, *the*

24

*statement that seems to be incomplete* that was given to the defense that the defense . . . has relied upon" for trial strategy.[11] [Emphasis added.] If this assertion was referring to Grandmother's written statement, then defense counsel was saying that the prosecutors had already provided the defense with a written statement from Grandmother, but that statement seemed to be incomplete. He did not elaborate on this argument for the trial court.

Dedrick did not produce at trial or the habeas hearing a copy of the statement that he had received from the prosecutors, and no evidence at either the trial or the habeas hearing showed that the prosecutors—or, for that matter, anyone in law enforcement—had a different version of Grandmother's statement in its possession, custody, or control. Further, the trial court did not admonish the State for not producing a written statement.

In sum, viewing the evidence in the light most favorable to the trial court's ruling, the record supports a finding that the prosecutors did not repeat any alleged misconduct despite a trial court's admonishment.

---

[11]In response, the prosecutor addressed the recording of Amy, stating, "as to the video that was sent from [Grandmother] to [PCSO], which has been previously provided to counsel for the defendant, that is all we have. If there is something else, that would be in the possession of [Grandmother]." To the extent that defense counsel was referring to a written statement, the prosecutor did not address that assertion.

**3. Did the prosecutor provide a reasonable, "good faith" explanation for the conduct or was the conduct "clearly erroneous"? If the conduct was clearly erroneous, was there nevertheless a legally or factually plausible basis for the conduct?**

We consider the third, fourth, and fifth factors together. With respect to whether the State's conduct was "clearly erroneous," if the bodycam video was exculpatory or "material to any matter involved" in the case, the State was obliged to produce it upon Dedrick's request. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (requiring State to produce any witness statement that is exculpatory or material to a matter involved and within the State's custody, control, or possession); *State v. Heath*, 696 S.W.3d 677, 697 (Tex. Crim. App. 2024) (holding that Article 39.14 imposes a duty on prosecutors to disclose evidence even if the evidence is in the possession of law enforcement rather than the prosecutor). The State concedes that the failure to produce the bodycam footage violated Article 39.14, and we agree. *See Heath*, 696 S.W.3d at 697.

Dedrick argues that the State's explanation for withholding the evidence was "not made in good faith" because the State "never attempted to locate the video" and that, "by claiming that any 'missing evidence' was lost in a ransomware attack, [the State] has created the pretextual excuse to avoid its discovery obligations" and "has a perfect excuse to engage in the very conduct that [Article 39.14] was designed to combat." He asserts that "Parker County used this ransomware attack to simply not seek out evidence and will blindly say 'it was lost in ransomware.'" He maintains that

"[t]he only plausible explanations" for the State's initial failure to find the video only for it be produced later were "willfully disregarding of the requests made by [Dedrick] or intentionally withholding the evidence with knowledge of its existence."

The record does not support these arguments. We agree with the State that it showed that it had a plausible basis for its failure to disclose the bodycam video and that its actions leading up to the mistrial were inconsistent with intentional conduct. All the evidence related to the prosecutors' intent is that they sincerely, though mistakenly, believed that the bodycam footage had been lost. Further, the record supports a finding that the State's disclosing the video mid-trial was not intended to provoke a mistrial.

- Evidence at the habeas hearing showed that Charanza had, in fact, attempted to obtain evidence stored in Axon. When he was unable to access the case in Axon, Charanza contacted Riedy, another D.A.'s Office employee, who contacted Vandygriff, who said that PCSO did not have anything for the case. Charanza's and Vandygriff's emails were admitted at the hearing.

- Thanks to Grimes's typo in uploading the file, Charanza's and Vandygriff's searching by case number would not have turned up the file.

- PCSO Captain Fletcher testified at the habeas hearing that he had reviewed the file's audit trail in Axon, and it showed that the bodycam footage had never been shared with the D.A.'s Office.

- That being the case, no prosecutor who worked on the case and searched in Axon would have had access to the footage before it was shared, and thus the trial court could have found that no prosecutor could have watched it and then decided to withhold it.

- Little testified at the habeas hearing that she worked in records retention and was not an evidence clerk, and she therefore would not have been the correct person for Charanza to ask to produce the evidence. She further testified that contacting Vandygriff, who was an evidence clerk, was the correct step. In other words, the fact that Little was able to find the video did not make Vandygriff the wrong person for the State to have contacted for access to it.

- Vandygriff testified at the habeas hearing that she had searched by case number and had not found the bodycam video; that she knew there had been a ransomware attack that had affected evidence in cases filed in 2020; and that because of the attack, if she could not find a file, she suspected that it had been lost in the attack.

- She further stated that she could not remember searching for files in this case using any method other than searching by case number and that she could not say that at the time of Riedy's request, she knew how to search for files by deputy name.

- Fletcher testified that the average PCSO worker "didn't know the difference between one digital piece of evidence to another," and he would not be surprised if some employees thought the Axon files had been lost in the attack.

- Little similarly testified that there had been no training by PCSO on what evidence had been lost and what had not been affected by the ransomware attack.

Even if we impute the PCSO employee's actions to the prosecutors for purposes of the double-jeopardy analysis—and Dedrick does not argue that we should—the record does not support a finding that the PCSO employee's actions were intentional. There is no evidence that Vandygriff lied about not finding the file when she searched for it or that she knew it had not been lost in the ransomware attack and intentionally misrepresented its availability. Additionally, there is no evidence in the record that Grimes intentionally mistyped the case number when

28

uploading the file to Axon or that Grimes or another PCSO employee intentionally failed to designate the file as "shared" to make it available to prosecutors.

Dedrick asserts that he had requested discovery four years before the jury trial commenced, that he made repeated requests after that, and that the factual basis asserted by the State for the late disclosure is "not plausible." But nothing in the record shows that the prosecution knew of the bodycam footage's existence before Little located it, at which point the State properly disclosed it. The State's explanation is supported by the Axon audit trail, by Vandygriff's email to Riedy, and by PCSO employee testimony. Thus, the record supports a finding that the State had a plausible basis for its disclosing the evidence mid-trial and for not disclosing it earlier.

**4. Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?**

Regarding the fifth factor, Dedrick again argues that the D.A.'s Office has been "admonished repeatedly in the past" for a "disturbing pattern of failing to turn over exculpatory evidence," but he does not point to any evidence in the record to support his allegation. The only other incident in the record was the one discussed above involving the Weatherford Police Department, and there is no evidence in the record that prosecutors were admonished for that incident. Dedrick argues that the State knew that its mid-trial disclosure "would force [him] to request a mistrial," and he references the recording of Amy and the written statement by Grandmother that he contends were not produced by the State. Dedrick did not produce the recording of

Amy or Grandmother's written statement, and thus the trial court had no basis from which to find if or how the recording of Amy or Grandmother's written statement that Dedrick had received from the State were different from what the State had in its possession, custody, or control.

Dedrick asserts that the prosecutors' actions "are consistent with intentional conduct" and that "[o]nly when [defense counsel] exposed the absence of specific evidence as a cornerstone of its strategy did the prosecution belatedly produce" the bodycam footage, which he contends was "no mere oversight" but rather "a deliberate course of conduct."

Because the trial court's ruling, including any finding relating to whether the prosecutors' conduct was intentional, was "based on an evaluation of the [prosecutors'] credibility and demeanor, we defer to the trial court's findings." *See Sandifer v. State*, 233 S.W.3d 1, 3–4 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Considering the evidence in the light most favorable to the trial court's ruling, the court did not abuse its discretion in determining that the State did not intentionally withhold and then intentionally disclose evidence mid-trial to provoke defense counsel to request a mistrial. We overrule this part of Dedrick's issue.

### C. To the extent raised, the *Masonheimer* exception does not apply

Dedrick's brief primarily argues that the prosecutors intentionally provoked defense counsel to request a mistrial. But some statements in his brief could be read as arguing that the exception discussed in *Masonheimer* applies. For example, he asserts

that prosecutors were willful in their suppression of evidence, as evidenced by their failure to ask Little about the video's existence before trial. Likewise, as noted above, Dedrick also argues that the State withheld a recording of Amy and Grandmother's written statement. Combined with his assertion that the bodycam video was exculpatory, Dedrick's brief could be read as arguing that *Masonheimer* applies because prosecutors intentionally withheld evidence in order to avoid an acquittal.

We have discussed the evidence from which the trial court could have found that there was no intentional failure to disclose evidence. Additionally, the trial court could have found that nothing in the bodycam video itself or elsewhere in the record suggests that the State "believed that the undisclosed evidence may have made the difference between a conviction and an acquittal." *See Masonheimer*, 220 S.W.3d at 508 n.18. Even if we were to agree with Dedrick that the video was exculpatory, the trial court could have found that the prosecutors were not aware that the footage existed before trial and had not seen it, and therefore they could not have intentionally suppressed it in order to avoid an acquittal. *See id.* at 507–08 (requiring intentional conduct by the State for exception to apply). To the extent that Dedrick relies on the exception articulated in *Masonheimer*, we overrule this part of his issue.

### D. Summary

In this case, viewing the record in the light most favorable to the trial court's ruling, the record supports a finding by the trial court that the State had not

committed an intentional act with the intent to goad Dedrick into moving for a mistrial or to avoid the possibility of his acquittal. We overrule Dedrick's sole point.

## Conclusion

Having overruled Dedrick's sole point, we affirm the trial court's order.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  March 12, 2026